Submitted July 22, 2014, affirmed August 19, 2015, petition for review denied January 14, 2016 (358 Or 529)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

KENNETH CHARLES McPHAIL,
*Defendant-Appellant.*

Umatilla County Circuit Court
CFH110028; A152083

359 P3d 325

Peter Gartlan, Chief Defender, and Jedediah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Susan G. Howe, Senior Assistant Attorney General, filed the brief for respondent.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Defendant appeals a judgment of conviction for unlawful possession of a weapon by a prison inmate. ORS 166.275.[1] He assigns error to the trial court's refusal to permit him to present the defenses of self-defense and choice of evils.[2] For the reasons explained below, we conclude that the trial court did not err and, accordingly, affirm.

"We review the record to determine whether [the] defendant presented any evidence to support the defenses he sought to assert and evaluate that evidence in the light most favorable to [the] defendant." *State v. Miles*, 197 Or App 86, 88, 104 P3d 604, *rev den*, 338 Or 488 (2005).

Defendant is an inmate at Two Rivers Correctional Institution (TRCI) in Umatilla County. During a random search by a corrections officer, defendant was discovered to be in possession of a sharpened toothbrush handle. During an investigation of the matter, defendant admitted possessing the sharpened toothbrush handle, and observed that prosecuting him for possessing it "didn't really matter" because he was already "doing forever and a day." Defendant was charged with unlawful possession of a weapon by a prison inmate.

Before trial, defendant served a notice that he intended to rely on the defenses of self-defense and choice of evils. In response, the state filed a motion *in limine* seeking to have the court conclude that those defenses were unavailable. The state requested a pretrial hearing pursuant to

_____

[1] ORS 166.275 provides:

"Any person committed to any institution who, while under the jurisdiction of any institution or while being conveyed to or from any institution, possesses or carries upon the person, or has under the custody or control of the person any dangerous instrument, or any weapon including but not limited to any blackjack, slingshot, billy, sand club, metal knuckles, explosive substance, dirk, dagger, sharp instrument, pistol, revolver or other firearm without lawful authority, is guilty of a felony and upon conviction thereof shall be punished by imprisonment in the custody of the Department of Corrections for a term not more than 20 years."

[2] In his ninth assignment of error, defendant asserts that the trial court erred "by instructing the jury that it could convict defendant on a vote of only 10 out of 12 jurors." We reject that assignment of error without discussion. *See State v. Cobb*, 224 Or App 594, 198 P3d 978 (2008), *rev den*, 346 Or 364 (2009).

OEC 104.[3] At the hearing, defendant offered testimony from five witnesses, all of whom were inmates at TRCI. The inmates testified about the level of violence and the housing arrangements at TRCI. They also offered testimony regarding their knowledge about defendant.[4]

The first inmate, Perez, testified that he is housed in a unit of TRCI that is considered a gang unit and that, in the past, he and defendant had been housed in the same unit. He also described an incident in which another inmate, who was considered a "snitch," had been placed in his unit and an altercation between them ensued. Perez also noted that he had witnessed other fights while in custody, with the longest lasting a few minutes.

A second inmate, Peacock, testified that he has been at TRCI since 2010. He has no ties with any gangs and was concerned that inmates who do not participate in gangs can become victimized by active gang members. Due to his concerns, he requested to be placed in a "nonviolent" housing unit at TRCI, and corrections officers responded by placing Peacock in a unit that they characterized as "nonactive"— that is, not used to house active gang members. Peacock testified that, on occasion, when an active gang member was

---

[3] OEC 104 provides, in part:

"(1) Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege or the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (2) of this section. In making its determination the court is not bound by the rules of evidence except those with respect to privileges.

"(2) When the relevancy of evidence depends on the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition.

"(3) Hearings on the admissibility of confessions shall in all cases be conducted out of the hearing of the jury. Hearings on other preliminary matters shall be so conducted when the interests of justice require or, when an accused is a witness, if the accused so requests."

[4] Defendant informed the court that, with respect to his proposed witnesses' testimony, he would not be "laying the normal impeachment and foundational * * * bases, since this is just to see the relevancy, we'll just get straight to the gist of what the testimony will be." Later during the hearing, the state noted that, as the proposed testimony was presented, it had not "been objecting in specific instances to what the State feels will be inadmissible testimony at trial [such as hearsay], simply because we're here in general for the admissibility and relevance. I hope—I assume that that's the correct procedure, so that we can just get through all of this * * *." The court agreed that that procedure was appropriate.

"coming out of the hole," he would be placed in that unit and would typically start an altercation. Peacock also testified that he had seen people "get beat up" at TRCI.

According to Peacock, when an inmate requests to be moved to a different housing unit, the time it takes to receive a response varies. If an inmate makes a verbal request to a corrections officer, they could "get it done right away." A written request "might take a week." Sometimes requests to move are denied. Peacock testified that he and defendant had previously been housed in the same nonactive unit. However, in 2010 or 2011, defendant had been in an altercation and he "went to the hole." Thereafter, Peacock "heard he went to an active unit"—that is, a unit with active gang members. Peacock had also heard rumors "around the institution" that defendant had "a price on his head"—that is, gang members were expected to "jump him"—for "being a snitch." Peacock had not heard any specific threats regarding defendant, just that "he would be got soon." In his view, a person who was thought to be a snitch would be safest in administrative segregation or in a nonactive unit.

The third inmate, Guiley, was housed at TRCI in what he called a "dropout" unit (another term for a nonactive unit). According to Guiley, inmates in those units are there "either for protective custody or [because they] are dropping out of gangs." People who seek to leave gangs can "no longer walk main lines" in prison because inmates who remain members of the gang "have what they call a green light * * * to take you out. If they see you, jump on you, beat you down, stab you, or whichever comes first." At one point, when Guiley "came out of the hole," he was placed in an active unit where defendant had also been placed. Guiley was moved to another unit approximately eight hours after he informed prison staff that an active unit was not an appropriate placement for him.

Guiley, who is good friends with defendant, testified that he had heard other inmates make derogatory comments about defendant. In the fall of 2010, he heard gang members talking about how they were "going to take [defendant] out" when they had a chance. Guiley tried to get a message to defendant through the prison grapevine "to let him know [to] watch his back."

Johnson was the fourth inmate whose testimony defendant sought to introduce. According to Johnson, he was the founding member of a gang and is serving a life sentence for killing a member of a rival gang. He explained that violence occurs between rival gang members and that, although he is no longer an active gang member and is now in a nonactive unit, sometimes active gang members have been placed in the unit. Furthermore, according to Johnson, there are times and places in TRCI where one inmate could assault another.

Johnson stated that he had heard that defendant was under threat from the Skinhead gang. From the prison "rumor mill," Johnson understood that, if defendant was placed in an active unit, he would be assaulted "not physically with just hands, but with a weapon." Johnson told defendant to be careful because Johnson had heard defendant was in danger from "white supremacists on the active units." Johnson had seen members of the gang in question hurt people on past occasions. Johnson also described that, on more than one occasion, he and defendant, had requested to be moved to different units, but had not gotten responses.

The fifth witness defendant sought to call was Cechmanek, who was a former member of a white supremacist gang and who had not been at TRCI in October 2010. Although he was no longer affiliated with the gang, when he arrived at TRCI, Cechmanek was initially placed in an active unit. He was moved to a nonactive unit three days after he informed a corrections officer that he needed to be moved. Cechmanek had heard that defendant is considered a snitch because Skinhead gang members believe that he gave testimony in 1999 or 2000 that "put somebody on death row." According to Cechmanek, when he had been a member of that gang (he had cut ties with the gang about five years before), members of that gang had been instructed to kill or seriously injure defendant if they saw him. The threat against defendant had been outstanding since about 2000.

Counsel also summarized defendant's expected testimony. That was that defendant had "spent eight years in protective custody * * * just prior to this incident, and had

been put in a nonactive unit. And then a little bit before had been moved to an active unit * * *." In addition,

> "[defendant] is going to testify that he had received recent threats, that they were specific, that within a week before this incident occurred they had started to increase and gain specificity and tell them specifically that—they had raised up the level of animosity toward him, and that they were going to try to kill. That there was an incident where in a kitchen—just a few days before this where they said, 'Now it's on. Now it's gonna happen.' And there were a series of fights leading up to the conversation in the kitchen when he was told, 'We have just raised the threat level on you.'"

Furthermore, defendant intended "to say that he asked several times to be moved from the housing unit he was in and was denied; that he did kites and put his request in writing at least three times and was denied."

The state asserted that the defenses of self-defense and choice of evils were not available to defendant under the circumstances of this case and the evidence sought to be presented was irrelevant and, thus, inadmissible. The state emphasized that, although both defenses require an imminent threat of harm, here, there was no "evidence of any immediacy" and the imminence requirement could not be satisfied. With respect to self-defense, defendant noted that he was "honestly * * * more concerned with the choice of evils than the self-defense," but, nonetheless, contended that "preparation to defend yourself should be included in defending yourself." "So if the illegal act that we're trying to justify with self-defense is getting a weapon or having a weapon or making a weapon, then that would be included in self-defense." Furthermore, focusing on choice of evils, defendant contended that the threat was sufficiently imminent. The court, noting that it had reviewed the pertinent cases, concluded that the state was correct and granted the state's motions "for the reasons set forth on the record [in the state's argument] and in the State's motions and memorandum." Thus, defendant was not permitted to present his proposed evidence relating to the defenses and his proposed jury instructions on self-defense and choice of evils were not given.

On appeal, defendant contends that he was entitled to rely on the defenses of self-defense and choice of evils. In his view, the "trial court erred when it granted the state's motion *in limine*, prohibited defendant from presenting evidence in support of [those] defenses, and did not instruct the jury as to the defenses." The state responds that defendant failed to submit sufficient evidence to justify relying on either defense.

ORS 161.200 defines the choice-of-evils defense:

"(1)   Unless inconsistent with other provisions of chapter 743, Oregon Laws 1971, defining justifiable use of physical force, or with some other provision of law, conduct which would otherwise constitute an offense is justifiable and not criminal when:

"(a)   That conduct is necessary as an emergency measure to avoid an imminent public or private injury; and

"(b)   The threatened injury is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue.

"(2)   The necessity and justifiability of conduct under subsection (1) of this section shall not rest upon considerations pertaining only to the morality and advisability of the statute, either in its general application or with respect to its application to a particular class of cases arising thereunder."

"A choice of evils defense is a defense of justification," *State v. Oneill*, 256 Or App 537, 539, 303 P3d 944, *rev den*, 354 Or 342 (2013), and the "trial court has a screening function in determining whether the evidence is sufficient to send the choice of evils question to the jury," *State v. Marsh*, 186 Or App 612, 615, 64 P3d 1141, *rev den*, 335 Or 655 (2003).

"Whenever evidence relating to the defense of justification is raised by a defendant, it is for the lower court at trial and for this court on review to determine whether that evidence entitles him to a jury instruction. However, it is for the jury to determine the weight of that evidence in establishing the defense. If there is any evidence in the

record from which the jury could infer the required elements of justification, the issue should be submitted to them."

*State v. Matthews*, 30 Or App 1133, 1136, 569 P2d 662 (1977). In other words, "[a] criminal defendant is entitled to instructions on all issues of law arising from the evidence and to present his theory of defense if that theory is supported by the evidence." *State v. Webber*, 85 Or App 347, 351, 736 P2d 220, *rev den*, 304 Or 56 (1987). Thus, the question is whether defendant presented evidence from which the jury could have inferred all of the required elements of the proposed defense.

To assert a choice-of-evils defense, a defendant must present evidence that

"(1) his conduct was necessary to avoid a threatened injury; (2) the threatened injury was imminent; and (3) it was reasonable [for the defendant] to believe that the need to avoid that injury was greater than the need to avoid the injury that * * * the statute that he was found to have violated[] seeks to prevent."

*State v. Boldt*, 116 Or App 480, 483, 841 P2d 1196 (1992).

In the state's view, defendant failed to present evidence that it was necessary for him to possess a weapon because he had no legal options available. *See State v. Freih*, 270 Or App 555, 557, 348 P3d 324 (2015) (to "show that criminal conduct was 'necessary' within the meaning of ORS 161.200, defendant was required to put forth evidence that would allow the jury to find that he had no reasonable alternative but to commit the crime"); *Miles*, 197 Or App at 93 ("For a defendant's conduct to be 'necessary' to avoid a threatened injury, he must show that no other course of action was available to him but to 'choose an evil.'"). The state also asserts that defendant "failed to introduce evidence that he was required to possess a weapon as an emergency measure or, in other words, that he faced a threat of imminent harm." (Boldface omitted.) We agree with the state that defendant did not present evidence of an imminent threat and, therefore, was not entitled to a choice-of-evils defense.

"An imminent threat is one that is immediate, ready to take place, or near at hand." *State v. Taylor*, 123 Or App 343, 348, 858 P2d 1358 (1993); *see State v. Whisman*, 33 Or App 147, 151, 575 P2d 1005 (1978) (the harm a defendant seeks to avoid must be present and impending; "a threat of future injury [is] insufficient"). "To show that the injury that the defendant sought to avoid was 'imminent' within the meaning of the statute, defendant was required to show that the threat of injury existed *at the time* that defendant committed his offense." *Freih*, 270 Or App at 557 (emphasis in original); *see Boldt*, 116 Or App at 483-84 ("In order for a threatened injury to be 'imminent' * * *, the threat must exist at the time of the commission of the charged offense.").

We have examined the imminence requirement in a number of cases that are helpful here. In *Boldt*, the defendant had been threatened that, if he appeared in court on a particular date, "his legs would be broken or he would be murdered." 116 Or App at 484. Under those circumstances, the threat of injury "existed on the day that [the] defendant was scheduled to appear and was conditioned on what he might do on that date." *Id.* Accordingly, we concluded that "the threat about which [the] defendant testified was 'imminent' within the meaning of ORS 161.200," and the defendant was entitled to a jury instruction on choice of evils.

Likewise, in *Taylor*, 123 Or App 343, the defendant sought to raise a choice-of-evils defense. In that case, the defendant was an inmate at a correctional institution and was assigned to the same dormitory as Bay, another inmate who the defendant knew had been imprisoned for manslaughter. The "[d]efendant was required to walk past Bay's bunk to go anywhere in the unit, including the bathroom." *Id.* at 346. The defendant and Bay had been involved in fights in the past and, in the two hours before the event at issue, had fought three times, and Bay had "twice threatened to stab [the] defendant with a pencil while [the] defendant was sleeping." *Id.* The defendant wanted to go to the bathroom but, in light of Bay's threats, was afraid to walk past Bay's bunk. The defendant "put a lock into a sock and put the device in his pocket before going to the bathroom." *Id.* at 347. "When [the] defendant approached, Bay jumped

quickly from his bed and had the pencil in his hand" and an altercation between the defendant and Bay ensued. *Id.* at 348. The defendant was subsequently charged with possession of a weapon by an inmate and attempted assault. We concluded that the defendant had presented sufficient evidence that the threatened force was imminent.

In contrast, in *State v. Seamons*, 170 Or App 582, 13 P3d 573 (2000), we considered whether a trial court, on a motion *in limine*, properly precluded the defendant from relying on a choice-of-evils defense. In that case, the defendant had been recruited by a police officer to sell heroin. After the defendant used some of the drug and fell behind on what he owed the officer, the two met and the "defendant paid the officer all but $400 of what he owed." *Id.* at 584. The officer told the defendant "not to cross him" and gave him "four days to come up with the $400 and promised to check up on him." *Id.* The defendant later "scheduled a meeting with the officer at which time [the] defendant was to produce the $400." *Id.* "The day before the meeting, [the] defendant purchased a toy gun and used it to rob a postal annex of $500." *Id.* The defendant attempted to raise a choice-of-evils defense, asserting that "he had no choice but to rob the postal annex to prevent the officer from doing him bodily harm." *Id.* We concluded, based on those facts, that there was "a complete absence of evidence of an imminent threat," and, therefore, the trial court "did not err in granting the state's motion *in limine.*" *Id.* at 586.

Similarly, in *Whisman*, we considered whether a defendant, who was charged with escaping from the custody of his probation officer, could present a choice-of-evils defense. The defendant "admitted the escape but sought to show by offer of proof that he did so in order to avoid being returned to the Multnomah County Courthouse Jail where he had been beaten by other prisoners while imprisoned there [a couple of months before], and forced to commit oral sodomy." 33 Or App at 149. We concluded that the defendant was required to demonstrate that "the harm which the defendant sought to avoid was 'present, imminent and impending,'" but, in view of the evidence presented by the defendant, that the harm sought to be avoided did not meet that requirement. *Id.* at 152.

Here, the harm in question was not immediate or impending. The threat against defendant had been outstanding for approximately a decade by the time he was found in possession of the weapon. Indeed, there was no evidence that defendant had been specifically threatened on the day in question. Instead, the most recent threat had been made days before. Nor were the threats specific to a particular time or action on defendant's part such that, as in *Boldt*, we could say that the threat was to have been carried out on the day that defendant was found in possession of the weapon. Likewise, defendant was not faced with a direct threat of immediate injury at the time. He had preemptively armed himself to respond if the threat were carried out at some unknown future point. To rely on a choice-of-evils defense, a defendant must have undertaken an emergency measure to avoid an imminent injury. That is not what occurred in this case. Thus, we conclude that the trial court did not err in precluding defendant from presenting a choice-of-evils defense to the jury.

We reach the same conclusion with respect to defendant's contention that the court erred when it did not instruct the jury or permit him to present evidence relating to self-defense. A person's right to self-defense is set forth in ORS 161.209, which provides:

> "Except [for circumstances not relevant here], a person is justified in using physical force upon another person for self-defense or to defend a third person from what the person reasonably believes to be the use or imminent use of unlawful physical force, and the person may use a degree of force which the person reasonably believes to be necessary for the purpose."

Thus, the defense of self-defense, like choice of evils, has an imminence requirement.[5] Where the harm against which a defendant seeks to defend himself is not imminent, the defense is not available. As we have explained, in this case, defendant was not faced with imminent harm. Thus, he was

---

[5] We note that, as the state points out, generally, the defense of self-defense is available to a defendant who is "charged with a crime for using physical force against another person." *State v. Beisser*, 258 Or App 326, 334, 308 P3d 1121 (2013). Here, defendant was not charged with a crime involving the use of force against another.

not entitled to justify his actions as self-defense and the trial court did not err in precluding him from doing so.

Affirmed.